### UNITED STATES of America

v.

### Orville OWENS, a.k.a. "Ratty"; and Earl Josephs, a.k.a. "Quame"

### No. 3:99CR290 (EBB).

United States District Court, D. Connecticut.

April 12, 2001.

---

David A. Ring, U.S. Attorney's Office, Hartford, CT, for Plaintiff.

Sarah A. Chambers, Paul F. Thomas, Federal Public Defender's Office, New Haven, CT, William H. Paetzold, Moriarty & Paetzold, Glastonbury, CT, for Defendants.

*Ruling on Defendants' Motions to Suppress and Motion to Sever*

BURNS, Senior District Judge.

Defendant Earl Josephs moves, pursuant to Fed.R.Crim.P. 12(b), to suppress all oral and written statements made by him to law enforcement officers on November 15, 1999 because they were obtained in

violation of his constitutional rights. [Doc. No. 32] Similarly, Defendant Orville Owens moves to suppress all oral and written statements made by him to law enforcement officers on December 16, 1999 at the Hartford Correctional Center, and all statements made by him to law enforcement officers and to the grand jury on December 21, 1999 at the United States Courthouse in Hartford. [Doc. No. 27] Finally, Defendant Josephs moves, pursuant to Fed.R.Crim.P. 14, to sever his case from co-defendant Owens based on prejudicial joinder and a possible *Bruton* problem. [Doc. No. 34] For the reasons that follow, Defendants' motions to suppress are DENIED, and Defendant Josephs' motion to sever is GRANTED.

## I. BACKGROUND

On January 19, 2000, a grand jury returned a four-count superceding indictment charging Defendants with Affecting Commerce by Robbery and Violence, in violation of 18 U.S.C. § 1951, and Possession of Marijuana with Intent to Distribute, in violation of 21 U.S.C. §§ 841(a)(1) and 846. The Government also alleges in Counts 1 and 2 that Defendants murdered Lizette Hamilton in the course of the robbery.

On June 10, 1998, Ms. Hamilton was killed in her apartment at 30 Morris Street, Hartford, Connecticut. Ms. Hamilton was found bound with packaging tape at the hands, feet, and neck, with multiple stab wounds to the neck, heart, and navel. Police later discovered that Ms. Hamilton's sister was storing twenty-nine pounds of marijuana in the apartment, and that Ms. Hamilton was allegedly killed as part of a robbery of the drugs.

According to Josephs, he and Owens were driving over to visit Ms. Hamilton so that Josephs could have sex with her. When they reached the apartment, Hamilton invited them in and said she was hungry, and Josephs left to get her a soda from the corner store. When he returned fifteen minutes later, Josephs said he found the apartment door open, and Ms. Hamilton bound and bleeding on the bed. According to Owens, however, Josephs asked him to help rob Ms. Hamilton of the marijuana stored in her apartment. Upon arriving at the apartment, Owens held Ms. Hamilton at gunpoint and asked her for the marijuana. Ms. Hamilton gave them one pound, at which point Josephs taped Ms. Hamilton's arms, legs, and mouth and proceeded to stab her to death, while, according to Owens, he "begged" Josephs not to kill her.

Both Owens and Josephs move to suppress various statements made by them both pre and post-arrest. Josephs moves to suppress his statement made to law enforcement officers on November 15, 1999 on the grounds that he was illegally detained, his statement was not made voluntarily, and the interrogation should have ceased when he requested an attorney. The Government contends that it had sufficient probable cause to arrest Josephs, that his statement was taken only after Josephs was properly mirandized, and that the interrogation was free of coercion. Owens moves to suppress his statements made on December 16, 1999 on the ground that he was improperly mirandized, and moves to suppress his statements made to a grand jury on December 21, 1999 on the ground that, after invoking his right to counsel, he was coerced into testifying. The Government maintains that on both occasions, Owens was advised of his rights, and knowingly and voluntarily waived them before making the statements. A suppression hearing was held on August 29–30, 2000, and the final post-hearing briefs were filed on December 6, 2000.

## II. LEGAL STANDARDS

### A. *Probable Cause*

■ When the constitutional validity of an arrest is challenged, the court must determine whether the facts available to the officers at the time of arrest supported probable cause. In general, probable cause to arrest "exists where 'the facts and circumstances within their [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed." *Brinegar v. United States*, 338 U.S. 160, 175, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949) (quoting *Carroll v. United States*, 267 U.S. 132, 162, 45 S.Ct. 280, 69 L.Ed. 543 (1925)); *Marshall v. Sullivan*, 105 F.3d 47, 54 (2d Cir.1996). This standard allows some room for mistakes, provided those mistakes are "those of reasonable men, acting on facts leading sensibly to their conclusions of probability." *Brinegar*, 338 U.S. at 176, 69 S.Ct. 1302.

■ In *Illinois v. Rodriguez*, 497 U.S. 177, 184, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990), the Supreme Court rejected the petitioner's attempt to impose the requirement that an officer's judgment regarding the facts in a giver instance not only be responsible, but correct. Instead, the *Rodriguez* Court held that "sufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment." *Id.* at 185, 110 S.Ct. 2793 (quoting *Hill v. California*, 401 U.S. 797, 803–04, 91 S.Ct. 1106, 28 L.Ed.2d 484 (1971)). In any given case, the question of whether the standard has been met must be determined by reference to the "totality of the circumstances," *Illinois v. Gates*, 462 U.S. 213, 231–33, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), on the basis of what information the arresting officer possessed at the time of the arrest.

### B. *Custodial Interrogation*

■ Because custodial interrogation is inherently coercive, when a defendant is in police custody, he must be advised of his *Miranda* rights, (namely his right to remain silent, his right to an attorney, and the fact that anything he says can be used against him), before interrogation commences. *See Miranda v. State of Arizona*, 384 U.S. 436, 479, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *United States v. Anderson*, 929 F.2d 96, 98–99 (2d Cir. 1991).[1] "Miranda warnings are intended principally to safeguard the suspect's privilege against self incrimination." *United States v. Ramirez*, 79 F.3d 298, 304 (2d Cir.1996). Once the warnings are administered, the defendant may "knowingly and intelligently" waive such rights and answer questions, but unless and until such warnings are given and waived, no statements obtained as a result of interrogation are admissible. *See Miranda*, 384 U.S. at 479, 86 S.Ct. 1602. *Miranda* warnings and a waiver of rights are prerequisites to the admissibility of any statement made by a defendant under interrogation while in the custody of the police. *See id.* at 476, 479, 86 S.Ct. 1602.

---

**1.** A defendant is "in custody" for *Miranda* purposes "when 'a reasonable person in the defendant's position would have understood himself to be subjected to restraints comparable to those associated with a formal arrest.'" *United States v. Ruggles*, 70 F.3d 262, 265 (2d Cir.1995) (quoting *United States v. Mitchell*, 966 F.2d 92, 98 (2d Cir.1992)); *Thompson v. Keohane*, 516 U.S. 99, 100–01, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995). A defendant is under "interrogation" for *Miranda* purposes when "the inquiry is conducted by officers who are aware of the potentially incriminating nature of the disclosures sought." *United States v. Morales*, 834 F.2d 35, 38 (2d Cir.1987); *Rhode Island v. Innis*, 446 U.S. 291, 300–01, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980).

■ If an interrogation proceeds without an attorney present, and a statement is taken, "a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." *Miranda*, 384 U.S. at 475, 86 S.Ct. 1602; *see also North Carolina v. Butler*, 441 U.S. 369, 372, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979). The Government must prove by a preponderance of the evidence that the suspect waived his *Miranda* rights. *See Colorado v. Connelly*, 479 U.S. 157, 168, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986); *Anderson*, 929 F.2d at 99.

■ Whether a defendant is advised of his *Miranda* rights speaks to the issue of voluntariness. In addition to being preceded by an advisement of rights, any statement subsequently made by a defendant must be voluntary for it to be admissible. The "ultimate issue of 'voluntariness' is a legal question requiring independent federal determination." *Miller v. Fenton*, 474 U.S. 104, 110, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985). The test for voluntariness of a confession is whether "the confession was 'extracted by any sort of threats or violence, (or) obtained by any direct or implied promises, however, slight, (or) by the exertion of any improper influence.'" *Hutto v. Ross*, 429 U.S. 28, 30, 97 S.Ct. 202, 50 L.Ed.2d 194 (1976) (quoting *Bram v. United States*, 168 U.S. 532, 542–43, 18 S.Ct. 183, 42 L.Ed. 568 (1897)). "A confession is not voluntary when obtained under circumstances that overbear the defendant's will at the time it was given." *Anderson*, 929 F.2d at 99; *see also Connelly*, 479 U.S. at 167–68, 107 S.Ct. 515. When making a determination of voluntariness, a court must consider the "totality of all the surrounding circumstances," including the defendant's "background and experience, the conditions of his interrogation and the conduct of the law enforcement officers." *Ruggles*, 70 F.3d at 264–65; *see also Butler*, 441 U.S. at 374, 99 S.Ct. 1755; *Anderson*, 929 F.2d at 99–100.

## C. Severance

■■ Severance is controlled by Fed. R.Crim.P. 14, which addresses whether the joinder of two or more defendants is prejudicial. *See United States v. Lane*, 474 U.S. 438, 447, 106 S.Ct. 725, 88 L.Ed.2d 814 (1986) (citing *Schaffer v. United States*, 362 U.S. 511, 515–16, 80 S.Ct. 945, 4 L.Ed.2d 921 (1960)). Severance motions are committed to the sound discretion of the district court. *See United States v. Harwood*, 998 F.2d 91, 95 (2d Cir.1993); *United States v. Tutino*, 883 F.2d 1125, 1130 (2d Cir.1989). Rule 14 provides:

> If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires.

Fed.R.Crim.P. 14. In *Bruton v. United States*, 391 U.S. 123, 126, 128, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), the Supreme Court held that a defendant's constitutional rights under the confrontation clause are violated when a non-testifying co-defendant's statement implicating the defendant as a participant in the offense is admitted at a joint trial. Therefore, if accusatory statements of non-testifying co-defendants are going to be admitted at trial, the resulting prejudice requires severance of their trials. *See id.* at 132, 88 S.Ct. 1620.

## III. DISCUSSION

### A. *Suppression Motions*

#### 1. *Defendant Earl Josephs*

##### a. *Legality of Detention*

The facts surrounding Josephs' arrest are substantially undisputed. On November 15, 1999, Josephs was stopped by INS Agent Steven Bach and other members of an FBI-led task force targeting major Jamaican drug traffickers in the Hartford area and investigating drug-related murders [hereinafter the "Task Force"], at approximately 12:45 p.m. while driving a white Toyota Camry. (Hearing Transcript of 8/29/00 [hereinafter "Tr. I"] at 40.) Prior to the stop, Detective James Rovella, another Task Force member, had determined, based upon a motor vehicle record check, (Def. Josephs' Exs. A, C), that Josephs' driver's license had been suspended. (Tr. I at 160–61.) Also prior to the stop, Agent Bach had obtained information that Josephs was born in Jamaica, that there was no record of him ever entering the United States, and that he had two prior aggravated felony convictions, which would allow him to be deported if he was not a U.S. citizen. (Tr. I at 46–48.) This information gave Agent Bach a reasonable suspicion to believe that Josephs was illegally in this country, and provided him with the authority, pursuant to 8 U.S.C. § 1357(a)(1), to stop and question Josephs regarding his immigration status. (Tr. I at 90–91.)

On the morning of November 15, 1999, Owens, previously arrested and detained on unrelated charges, made an incriminating statement implicating Josephs in the Hamilton murder to a fellow inmate that was recorded by members of the Task Force. Shortly after this statement was recorded, Agent Bach and others, who had been informed by Detective Rovella that Josephs' license was suspended, (Hearing Transcript of 8/30/00 [hereinafter "Tr. II"] at 8), located Josephs driving a white Toyota Camry and pulled him over. Agent Bach approached the car with his gun drawn, removed Josephs from the car, and placed handcuffs on him. The other six or seven officers involved in the stop also exited their vehicles and surrounded Josephs with guns drawn. Agent Bach asked Josephs his name and where he was born and, in response to Josephs' questioning why he had been stopped, told Josephs he did not have a driver's license. (Tr. I at 50–51, 86.)

Agent Bach then proceeded to question Josephs about his immigration status. Josephs admitted he was born in Jamaica, and, after first claiming that he had a green card, admitted that he had entered the country seven years ago on a visitor's visa and had married a U.S. citizen, but had not yet filed the necessary paperwork. This information confirmed Agent Bach's reasonable suspicion and gave him probable cause to arrest Josephs for illegally entering the United States. (Tr. I at 55–57.) At this point, Josephs was taken to the Hartford Police Department, served with a misdemeanor summons for operating a vehicle without a license, and informed that he was under arrest by the INS. Thereafter, Josephs was taken to a room to be questioned about the Hamilton murder.

Evidence presented at the hearing clearly established, and it is now undisputed, that it was Josephs' public service license, not his regular driver's license, that was under suspension at the time he was stopped. (Tr. I at 40; Def. Josephs' Exs. A, C.)[2] Detective Rovella testified that he

---

2. Josephs testified that the public service li- cense, which had permitted him to drive a

checked Josephs' driving history in the computer system, which indicated that he had a Class 2, non-commercial license. (Tr. II at 8–10.) The printout showed, on the non-commercial driver's license ("Non–CDL Status") line, that Josephs' license was "suspended," and the acronym "PPEC" appeared next to the word "suspended." While it is unclear whether Detective Rovella noticed the acronym "PPEC" at that time, he stated that he was not aware that the acronym qualified the suspended status, and admitted that he did not call the Department of Motor Vehicles to inquire. (Tr. II at 9, 11, 14–15.)

The Government established at the hearing that the acronym "PPEC" is not defined in any of the training material for the police computer system, and pointed out that the computer printout did not indicate that Josephs had anything other than a standard Class 2 driver's license.

Based on these essentially undisputed facts, Josephs argues that his arrest was unlawful because the Government lacked probable cause. Specifically, Josephs argues that the Government lacked probable cause on the grounds that 1) Josephs' regular driver's license was not actually suspended at the time of his arrest, and 2) the additional questions asked by Agent Bach to gain probable cause for the INS arrest were obtained in violation of his *Miranda* rights because at the time he was already handcuffed and had not been advised of his rights. The Government maintains that the arrest was lawful because at the time of the arrest it had probable cause to believe that Josephs 1) was driving with a suspended license, 2) had entered this country illegally, and 3) had participated in Ms. Hamilton's murder.

■ The Supreme Court has made clear that, under the Fourth Amendment, law enforcement officers may stop an individual for any lawful reason, regardless of the subjective intentions of the individual officers involved. *See Whren v. United States*, 517 U.S. 806, 813–14, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). Likewise, the Second Circuit has held that "an officer's use of a traffic violation as a pretext to stop a car in order to obtain evidence for some more serious crime is of no constitutional significance," and that "an observed traffic violation legitimates a stop even if the detectives do not rely on the traffic violation." *United States v. Dhinsa*, 171 F.3d 721, 724–25 (2d Cir.1998); *see also United States v. Scopo*, 19 F.3d 777, 784 (2d Cir.1994) (holding that "where the arresting officer had probable cause to believe that a traffic violation occurred or was occurring in the officer's presence, and was authorized by state or municipal law to effect a custodial arrest for the particular offense, the resulting arrest will not violate the fourth amendment"). Moreover, the fact that "an officer may be engaged in an arrest which would not usually be effected in the course of the officer's normal duties does not negate the validity of the arrest." *Scopo*, 19 F.3d at 783.

It is also clear, and Josephs does not appear to dispute, that under Connecticut law, officers are authorized to arrest a person who is driving with a suspended license. Connecticut General Statutes § 14–215 provides that operating with a suspended license is punishable by a fine of between $150 and $200 or not more than 90 days imprisonment for a first offense, and various Connecticut cases hold that officers have the authority to arrest drivers for such traffic violations. *See Connecticut v. Wilkins*, 240 Conn. 489, 692 A.2d 1233, 1238–39 (1997) (holding that because reckless driving is a misdemeanor

school bus, was suspended due to prior vio-

lent crime convictions. (Tr. II at 183–84.)

that carries a maximum possible penalty for a first offense of thirty days imprisonment and a fine of three hundred dollars, it is undisputed that, pursuant to General Statutes § 54–1f, the officer had the authority to arrest the defendant); *Connecticut v. Carolina*, 40 Conn.App. 762, 673 A.2d 562, 564–65 (1996) (rejecting petitioner's claim that officers lacked authority for custodial arrests when traffic violation is only punishable by fine because Connecticut statute applicable to arrests for motor vehicle violations, Conn. Gen.Stat. § 14–140(a), gives arresting officer discretion to release offender or to take him into custody); *Connecticut v. Thorne*, No. MV 980283001, 1999 WL 682067, *2 (Conn.Super.Ct. Aug. 16, 1999) ("It is undisputed that a police officer who observes a motor vehicle violation has the authority to conduct a 'valid traffic stop' and to arrest the operator for this violation.").

 Under these standards, it is clear that the officers' subjective intentions for stopping Josephs (i.e. their desire to interview him on the Hamilton murder) are irrelevant to our Fourth Amendment analysis, and that under Connecticut law, the officers were authorized to stop and detain a person for driving with a suspended license. The issue remaining is whether the arresting officers had probable cause to believe, when they saw Josephs operating his white Toyota Camry, that Josephs was committing or had committed an offense. Here, that question turns on the objective reasonableness of Detective Rovella's mistaken reliance on the Department of Motor Vehicle's computer records, and of the arresting officers' reliance on Detective Rovella's representation that Josephs' license was suspended.

As discussed above, the probable cause standard allows for mistakes, provided they are objectively reasonable under the circumstances. *See Brinegar*, 338 U.S. at 175–76, 69 S.Ct. 1302. Under this standard, the Supreme Court has found no constitutional violation where officers entered an apartment because they reasonably, though erroneously, believed that the person consenting to their entry was a resident of the premises, *see Illinois v. Rodriguez*, 497 U.S. 177, 186, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990), has upheld the search of an apartment based on the officer's mistaken, but reasonable, belief that it was covered by the search warrant, *see Maryland v. Garrison*, 480 U.S. 79, 88, 107 S.Ct. 1013, 94 L.Ed.2d 72 (1987), and has found that where an arrest is based on mistaken identity, and the officer's mistake is in good faith, both the arrest and the search incident to that arrest were lawful. *See Hill v. California*, 401 U.S. 797, 803–04, 91 S.Ct. 1106, 28 L.Ed.2d 484 (1971).

Similarly, the Second Circuit has upheld an arrest where probable cause was based on an out-of-state warrant later found to be inactive, *see United States v. Towne*, 870 F.2d 880, 884–85 (2d Cir.1989), and has upheld an arrest based on mistaken identity of the suspect, and the seizure of cocaine found in a search incident to that arrest, because the mistakes were objectively reasonable and made in good faith. *See United States v. Valez*, 796 F.2d 24, 28 (2d Cir.1986); *see also United States v. DeLeon*, 561 F.2d 421, 423 (2d Cir.1977).

Here, Detective Rovella relied upon a Department of Motor Vehicles computer printout which indicated that Josephs' driver's license was suspended. Although the printout contained the "PPEC" acronym, either Detective Rovella did not notice it, or no significance was attributed to it at that time. Josephs argues that the arrest was attributable to "police nonfeasance" and a "negligently" performed investigation, (Josephs' Reply Br. at 3), which, if upheld, "would encourage other law enforcement agents to push the envel-

ope to see what they can get away with before being called to task." (Josephs' Post–Hr'g Br. at 8.) The Government, however, urges that, although the officer could have done more to verify the accuracy of the computer information, his reliance on the computer record alone was not unreasonable because one would not expect the "suspended" status to apply to anything but Josephs' standard Class 2 license since the record did not indicate that Josephs had more than one license.

■■■ Under the totality of the circumstances here, the Court finds that Detective Rovella's reliance on the computer records and his mistake regarding the class of license actually suspended were reasonable, and made in good faith. Given that only one driver's license is listed on the driving record, the type of license is listed as standard Class 2, nothing indicates that Josephs had a commercial or public service driver's license, and the suspended notation is on the "Non–CDL Sta-

tus" line, as opposed to the "CDL Status" line, Detective Rovella's mistake was objectively reasonable. The Court further finds that the objective facts available to Agent Bach and the other arresting officers at the time, including Detective Rovella's representation regarding the suspended license and their own observations of Josephs driving a vehicle, were sufficient to support probable cause to believe that Josephs was committing an offense by driving with a suspended license.[3] Accordingly, because "[t]he deterrence function of the fourth amendment and the exclusionary rule is not served by invalidating a mistaken arrest or suppressing the fruits of such an arrest where the police acted in good faith and in a reasonable manner," *Valez*, 796 F.2d at 26, the Court concludes that Josephs was lawfully arrested and detained.

Because the Court finds that the Government had probable cause to believe that Josephs was driving with a suspended license, the Court does not reach the proba-

---

**3.** Moreover, even if the officers lacked probable cause to arrest Josephs for driving with a suspended license, because the officers acted in good faith, Josephs' post arrest statements would qualify as an exception to the exclusionary rule. The issue of whether the exclusionary rule's remedy is appropriate "has long been regarded as an issue separate from the question of whether the Fourth Amendment rights of the party seeking to invoke the rule were violated by police conduct." *Arizona v. Evans*, 514 U.S. 1, 10, 115 S.Ct. 1185, 131 L.Ed.2d 34 (1995) (quoting *Illinois v. Gates*, 462 U.S. 213, 223, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)). "The exclusionary rule operates as a judicially created remedy designed to safeguard against future violations of Fourth Amendment rights through the rule's general deterrent effect." *Arizona v. Evans*, 514 U.S. 1, 10, 115 S.Ct. 1185, 131 L.Ed.2d 34 (1995). Specifically, the exclusionary rule prohibits the admission at trial of any evidence, and derivative evidence, seized in violation of the Fourth Amendment. *See United States v. Santa*, 180 F.3d 20, 25–26 (2d Cir.1999). In *United States v. Leon*, 468 U.S.

897, 918–19, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), the Supreme Court held that the exclusionary rule "cannot be expected, and should not be applied, to deter objectively reasonable law enforcement activity." *See also Evans*, 514 U.S. at 13–14, 115 S.Ct. 1185 (holding that "exclusion is appropriate only if the remedial objectives of the rule are thought most efficaciously served"); *Towne*, 870 F.2d at 885 ("Applying the exclusionary rule in this case would not further the purpose of the rule, which is to deter police misconduct, because it was objectively reasonable for [the officer] to rely on the [out-of-state] warrant in arresting the defendant.")

Here, Detective Rovella's overlooking the "PPEC" acronym under these specific circumstances, and the arresting officers' reliance on Detective Rovella's representations does not, in the Court's view, constitute police misconduct. Indeed, testimony at the hearing revealed that the officers at the scene of the arrest believed at the time that Josephs' license was under suspension. (Tr. I at 8 (Det.Koch); Tr. I at 31 (Agent Bach); Tr. I at 161 (Det.Rovella)).

ble cause issues surrounding the INS charge and/or the murder.

### b. *Voluntariness of Statement*

The Government does not dispute the fact that Josephs was in police custody at the time he was interrogated by law enforcement officers on November 15, 1999 at the Hartford police station. Rather, Josephs' claims revolve around the issue of voluntariness. Josephs argues that his statement was not made freely or voluntarily because 1) he was never advised of his *Miranda* rights before making the statement, 2) the interview should have stopped when he asked for a lawyer, and 3) he was coerced and intimidated.

Upon his arrest, Josephs was taken to the Hartford police station, issued a motor vehicle summons for driving under suspension, and brought to an interview room to be questioned by Detective Rovella and Detective Jerry Bilbo, another Task Force member, regarding the Hamilton murder. Josephs testified that, before the interview began, Detective Rovella gave him a form and told him to sign it. When he asked why, he was again told to sign the paper. He then asked for a lawyer, and according to Josephs, Detective Rovella said "f—— the lawyer." (Tr. II at 187.) Josephs claims that he signed the paper because Detective Rovella was raising his voice, and he was afraid of what might happen to him if he did not sign the form.

On cross examination, Josephs maintained that at the time, despite the fact that he had a twelfth grade education, despite the fact that he could read and write, and despite the fact that he initialed each paragraph on the form, he did not know what the form was, he did not see that the paragraphs he initialed advised him of his rights, and he was forced to sign it without discussion. (Tr. II at 216, 218–19, 222–23.) When asked why he was afraid, Josephs explained that in his country, (Jamaica), "they come to your house, they kick the door off, and they beat you." (Tr. II at 188.) According to Josephs, Detective Bilbo was in the room and silently watched this interaction.

After Josephs signed the form, Detective Rovella proceeded to ask him questions, and, according to Josephs, repeatedly accused him of lying. During the first stage of the interview, which lasted approximately two hours, Josephs claims that he asked for food and water, but that Detective Rovella refused to give him any until he told them what they wanted to know. Josephs further claims that, as he sat on the table with his knees bent, Detective Rovella "swiped" his foot on two occasions as he accused him of lying and "whacked" a chair across the room. (Tr. II at 191–92, 194.) On cross-examination, however, after stating that he had read the motion to suppress filed by his attorney and that the facts set forth therein were based on conversations he had had with his attorney, Josephs had no explanation for the fact that the motion alleged that Detective Rovella had struck him in the leg on one occasion, rather than two. (Tr. II at 209–10.)

After two hours, the interview stopped, Detectives Rovella and Bilbo left the room, and twenty minutes later, State Police Trooper Andrew Crumbie, who is of Jamaican descent, entered the interview room. Josephs testified that he felt more comfortable with Trooper Crumbie because he could speak to him in Patois. According to Josephs, he told Trooper Crumbie that Detective Rovella was calling him a liar, refusing to give him food, and hitting him. (Tr. II at 193, 195, 213–14.) Josephs claims that Trooper Crumbie told him not to worry and ordered him some food, which arrived at the end of the interview. Josephs admitted, however,

that he neither asked Trooper Crumbie for a lawyer, nor told him that he had previously asked for one. When asked on cross why he left this out, Josephs stated that he was "so mad at Rovella." (Tr. II at 215.) Josephs and Trooper Crumbie talked for approximately a half hour, at which point Detective Rovella re-entered the room. Trooper Crumbie and Detective Rovella continued the interview together until approximately 8:00 p.m. when it ended. The entire interview lasted approximately six and a half hours.

Contrary to Josephs' claims, Detectives Rovella and Bilbo each testified that Josephs was advised of his rights, and that he agreed to waive them when he signed the form. (Tr. I at 111–12, 154–55.) According to both detectives, they repeatedly offered Josephs food and water, Detective Rovella never struck Josephs, and Josephs never asked for a lawyer. (Tr. I at 113, 155–56.) Further, Trooper Crumbie testified that although Josephs appeared angry, referred to Detective Rovella with Jamaican expletives, and said that Rovella did not understand him, Josephs never asked for a lawyer, never told him that he had previously asked for a lawyer, never told him that he had been abused or mistreated in anyway, and never told him that he had asked for food but was denied by Detective Rovella. (Tr. II at 60–62.) Finally, Trooper Crumbie watched Detective Rovella and Bilbo's interview of Josephs for several fifteen-minute increments throughout the interview, and maintained that he saw no signs of abuse or mistreatment. (Tr. II at 66–67).

▮ Applying the standards set forth above, the Court must examine 1) the defendant's background and experience, 2) the conditions of his interrogation, and 3) the conduct of the law enforcement officers to determine, under the totality of the circumstances, whether Josephs' statement was voluntary. *See Ruggles,* 70 F.3d at 264–65. More specifically, the Court must decide whether Josephs was advised of his rights, whether he asked for an attorney, and finally whether his will was overborne.

Very little information was revealed during the hearing about Josephs' background and experience, except that he has a twelfth grade education and can read and write. No evidence was presented, however, regarding Josephs' prior record or experience with the criminal justice system that would make him more or less familiar with *Miranda* warnings and waiver of rights forms. This factor, therefore, does not itself support a finding of voluntariness.

The factual details surrounding the general conditions of the interrogation are somewhat in dispute, but the basic facts are clear. The total interview lasted for approximately six and a half hours in a room at the Hartford Police Department. Josephs was not handcuffed, was permitted to move around the room, was permitted to use the facilities, was permitted to smoke several cigarettes, and at some point ultimately received a fish sandwich, fries, and a drink from McDonald's. Whether and at what point Josephs asked for food and/or was offered food by the agents was a point of contention at the hearing, but the Court finds this discrepancy insignificant since Josephs ultimately received food. The interview was admittedly lengthy, but there were several breaks throughout the six and a half hour time period. Therefore, the Court finds nothing in the record concerning the basic conditions of the interrogation that would affect the voluntariness of Josephs' statement.

The conduct of the law enforcement officers is the dispositive factor here. As both parties readily admit, Josephs' account of the November 15, 1999 interrogation and

the Government's account vary dramatically, and the Court's decision ultimately comes down to the issue of credibility.

Josephs makes much of the discrepancies between the officers' testimony regarding the food. While Detective Bilbo and Detective Rovella each testified that he was the one who offered Josephs food, their testimony was otherwise consistent in that the offer was made during the first two-hour session, and the defendant rejected it. Similarly, while Detective Rovella's and Trooper Crumbie's testimony differed on when the Defendant received the food, in the middle or near the end of the interview, their testimony was consistent in that he received a fish sandwich and fries from McDonald's. Aside from these discrepancies, the three officers' testimony was not in conflict. Therefore, the Court finds the discrepancies as to the exact timing and offering of food insufficient to undermine the overall credibility of the officers' testimony.

The Government points to various gaps in Josephs' account of the interrogation, three of which the Court finds significant. First, Josephs' testimony on cross that he told Trooper Crumbie that Detective Rovella hit him and deprived him of food and water, but did not tell him that his request for a lawyer was denied because he was "too angry," is curious. Second, Josephs' statement that he did not know at the time of the interrogation that the form he signed advised him of his rights and indicated his waiver of such rights is inconsistent with the fact that he can read and write, that he has a twelfth grade education, that he initialed each paragraph, and that he signed and dated the form. Moreover, his account of the interaction concerning the form changed under cross-examination. On direct, Josephs stated that Detective Rovella pushed the piece of paper toward him and told him to sign it

with no discussion. On cross, however, Josephs admitted that Detective Rovella had gone over at least the top of the form with him to fill in information on his name, date-of-birth, and level of education. (Tr. II at 220–22.) Finally, Josephs' claim that he was never advised of his rights is contradicted by the signed and initialed form. Therefore, the Court finds that these inconsistencies undermine Josephs' overall credibility.

Weighing the evidence on both sides, the Court finds insufficient proof of Josephs' claim that he was not advised of his *Miranda* rights, that he requested an attorney, and that his will was overborne by Detective Rovella's abusive conduct. Accordingly, the Court finds, based on the totality of the circumstances, that the Government has met its burden of proving that Josephs was advised of his rights and made a knowing and intelligent waiver of such rights. The generally consistent and credible testimony of the three detectives involved in the interrogation, combined with an initialed, signed, and dated waiver of rights form by a defendant with a twelfth grade education who can read and write establishes, by a preponderance of the evidence, that Josephs knowingly and intelligently waived his rights. The Court further finds that Josephs' statement was made voluntarily and finds insufficient evidence indicating that his will was overborne by intimidation, coercion, deception, or oppression by the law enforcement officers involved in the interrogation.

In sum, the Court concludes that the officers had probable cause to arrest Josephs for driving with a suspended license, and that his subsequent station house statement was voluntarily made after a proper advisement and knowing waiver of rights. Accordingly, Josephs' motion to suppress is denied.

## 2. *Defendant Orville Owens*

### a. *December 16, 1999 Statements*

The basic facts surrounding the December 16, 1999 interview at the Hartford Correction Center (HCC) are undisputed. Owens first became a suspect in November 1999 when he made incriminating statements to a fellow inmate at HCC where Owens was being held on a separate and unrelated charge. A check of Owens' fingerprints matched several fingerprints found on the tape used to bind Hamilton. On November 15, 1999, that fellow inmate cooperated with the Government to consensually record a conversation with Owens, wherein Owens implicated Josephs in the murder and boasted about killing Hamilton and stealing the marijuana. (Gov't's Resp. to Owens, Attachment B (transcript of conversation)). Based on this consensually recorded conversation, Detective Rovella and Agent Gentil went to HCC on December 16, 1999 to interview Owens regarding the Hamilton murder.

The interview began at 11:45 a.m. and took place in a captain's office in the administrative section of the jail. The agents identified themselves and advised Owens that they wanted to talk to him about the Hamilton murder. Detective Rovella then read Owens, (because he indicated that he could only read "a little"), a Department of Corrections (DOC) "Voluntary Interview Statement" [hereinafter "DOC Form"], advising him that he had the right not to be interviewed. Owens executed the form and agreed to talk to the agents. (Tr. I at

163–64; Tr. II at 98; Gov't's Resp. to Owens, Attachment D.) Owens was not handcuffed during the interview, but a corrections officer was posted outside the interview room and escorted Owens to and from the room for bathroom breaks.

Before the interview began, Detective Rovella orally advised Owens that he did not have to talk to the them, that he could stop talking at any time, that he was free to get up and leave the office at anytime, and that if he wanted an attorney one would be appointed for him. Owens responded that he knew his rights based upon prior arrests. It is undisputed that this was an informal and incomplete advisement of *Miranda* warnings since Detective Rovella failed to advise Owens that anything he said could be used against him.[4] (Tr. I at 178; Tr. II at 99.) Finally, at some point during the interview, Detective Rovella told him he was facing up to life in prison for the crimes.

At approximately 1:30 p.m., Owens agreed to give a written statement. At this time, Detective Rovella formally advised Owens of his rights by reading each paragraph on the standard waiver form.[5] Owens indicated that he understood those rights, and executed the form by signing it at the bottom, (Gov't's Resp. to Owens, Attach. E), and then gave a written and sworn statement. (Gov't's Resp. to Owens, Attach F.) Owens makes much of the fact that Detective Rovella did not have Owens initial each paragraph on the waiver of rights form as he had with Josephs. (Ow-

---

**4.** Detective Rovella testified that based upon his police training, he did not believe that Owens was in "custody" for *Miranda* purposes because Owens was not incarcerated for the crime he was being interviewed for and he was free to leave the interview, and, therefore, that no formal advisement of rights was necessary. (Tr. I at 164–65; 178–81.) When asked why in his initial oral advisement he had left out one part of the *Miranda* warn-

ings, he said "I probably forgot that statement, but I didn't think he was entitled to his Miranda warnings at that point anyway." (Tr. I at 178.)

**5.** When asked why he formally advised Owens of his rights at that time, Detective Rovella testified that "it was just as a precaution, being extra careful."

ens' Post–Hr'g Br. at 6.) Detective Rovella testified that Owens' inability to read was the reason for this discrepancy in procedure. Since Josephs could read, Detective Rovella explained, Josephs followed along as Rovella read him his rights and initialed each paragraph along the way. Rovella testified that having suspects initial each paragraph is his "practice when they can read." (Tr. I at 189.)

Based on these facts, Owens argues that both his pre-*Miranda* (oral) statements and his post-*Miranda* (written) statements were obtained in violation of his constitutional rights. Specifically, Owens argues that his pre-*Miranda* statements should be suppressed because his prison interview amounted to a "custodial interrogation," and, therefore, the incomplete oral advisement of rights given at the start of his interview violated his fifth amendment right against self-incrimination, and that his post-*Miranda* written statement should be suppressed because 1) the officers never properly advised him of his rights, 2) he did not "knowingly and intelligently" waive his rights, and 3) it is tainted by the earlier *Miranda* violation since the

post-*Miranda* written statement merely reduced the first half of the interview to writing.

The Government narrows the issues in its response by representing that due to the uncertainty of the case law in the Second Circuit on whether a prison interview is *per se* custodial for *Miranda* purposes, it will not seek to admit Owens' pre-*Miranda* statements at trial.[6] (Gov't's Resp. to Owens at 22; Gov't's Post–Hr'g Resp. to Owens at 2–3.) In regard to the post-*Miranda* statements, the Government maintains that the agents advised Owens of his rights, that he knowingly waived those rights, and that the statements are untainted by the earlier "violation." (Gov't's Post–Hr'g Resp. to Owens at 3.) The Court's discussion will center on whether the written statement is tainted by the earlier alleged violation because that determination requires findings on the advice and waiver of rights.

The Supreme Court has held that the "prophylactic" Miranda warnings are "not themselves rights protected by the Constitution but [are] instead measures to insure

6. In *Mathis v. United States*, 391 U.S. 1, 4–5, 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968), the Supreme Court held that persons interviewed in prison by law enforcement officers must be advised of their *Miranda* rights regardless of whether the questioning pertains to the charge for which that person is being held. In its holding, the Supreme Court assumed that the incarcerated person was "in custody," and rejected any kind of differentiation on the basis of the relatedness of the interview. "We find nothing in the Miranda opinion which calls for a curtailment of the warnings to be given persons under interrogation of officers based on the reason why the person is in custody." *Id.* Since this holding, all of the Circuits addressing the issue have held that people in jail are not necessarily "in custody" for *Miranda* purposes, and that some type of additional restraint must be imposed on an inmate to transform the interview into a custodial interrogation. *See Unit-*

*ed States v. Conley*, 779 F.2d 970, 972–73 (4th Cir.1985) (holding that prisoner in handcuffs and restraints in conference area awaiting medical examination was not in custody); *Cervantes v. Walker*, 589 F.2d 424, 427–28 (9th Cir.1978) (holding that prisoner undergoing routine search of prisoner's belongings was not in custody); *Garcia v. Singletary*, 13 F.3d 1487, 1491 (11th Cir.1994) (holding that prisoner outside his cell, after being removed due to mattress fire, was not in custody). The Second Circuit, however, has not directly addressed this issue. *See United States v. Morales*, 834 F.2d 35, 38 (2d Cir.1987) (because court found that questioning conducted by physician's assistant during a routine physical exam about a bag that fell out of prisoner's pants did not constitute interrogation for *Miranda* purposes, it did not consider whether the prisoner was in custody for *Miranda* purposes).

that the [Fifth Amendment] right against compulsory self-incrimination [is] protected." *Oregon v. Elstad,* 470 U.S. 298, 305, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985) (quoting *Michigan v. Tucker,* 417 U.S. 433, 444, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974)). The Court in *Elstad* also distinguished between the Fourth Amendment's "fruit of the poisonous tree" doctrine, and the *Miranda* exclusionary rule which serves the Fifth Amendment. The Court held that while it is clear that *Miranda* requires the unwarned admission to be suppressed, it is "an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to under mine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective," and, therefore, that the admissibility of any subsequent statements under these circumstances should turn "solely on whether it is knowingly and voluntarily made." *Id.* at 309, 105 S.Ct. 1285.

In so finding, the *Elstad* Court noted that the police's failure to administer *Miranda* warnings itself does not mean that the statements given were actually coerced, but only that the court will presume that the Fifth Amendment privilege has not been intelligently exercised. "Absent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion." *Id.* at 314, 105 S.Ct. 1285. Under these circumstances, the Court held that "a careful and thorough administration of *Miranda* warnings serves to cure the condition that rendered the unwarned statement inadmissible," *id.* at 310–11, 105 S.Ct. 1285, because "there is no warrant for presuming coercive effect where the suspect's initial inculpatory statement, though technically in violation of Miranda, was voluntary." *Id.* at 318, 105 S.Ct. 1285. The relevant inquiry, the Court held, "is whether, in fact, the second statement was also voluntarily made," since no further Fifth Amendment purpose is served by "imputing taint to subsequent statements obtained pursuant to a voluntary and knowing waiver." *Id.* at 318, 105 S.Ct. 1285.

The Second Circuit adheres to the holding in *Elstad,* but has cautioned that "*Elstad* is not a license for police to neglect *Miranda* warnings in order more easily to obtain a confession, on the theory that they can remedy the omission after the fact." *Tankleff v. Senkowski,* 135 F.3d 235, 245 (2d Cir.1998). Moreover, the Second Circuit reminded courts that "the use of coercive and improper tactics in obtaining an initial confession may warrant a presumption of compulsion as to a second one, even if the latter was obtained after properly administered *Miranda* warnings." *Tankleff,* 135 F.3d at 245 (quoting *United States v. Anderson,* 929 F.2d 96, 102 (2d Cir.1991)).

Under *Elstad* and *Tankleff,* therefore, in order to admit the second statement, the Court must find 1) that the pre-*Miranda* statement, despite the procedurally defective warning, was free of actual coercion or other improper tactics, and 2) that the post-*Miranda* statement was made knowingly and voluntarily. Finally, the Court must determine whether suppressing the post-*Miranda* statement would "serve the general goal of deterring unlawful police conduct and the Fifth Amendment goal of assuring the receipt of trustworthy evidence." *Id.* (quoting *Anderson,* 929 F.2d at 102).

█ In regard to the first question, the Court finds, based on the totality of the circumstances, that Owens' first statement was made voluntarily and was free of any

actual coercion. Before the interview commenced, Owens signed the DOC Form indicating his willingness to speak to the detectives, and before the questioning began, Detective Rovella orally advised Owens of the majority of his *Miranda* rights. The initial questioning lasted for approximately one and a half hours, and nothing in the record indicates that the interview conditions were coercive in nature or that the agents attempted to trick, deceive, or improperly coerce Owens in any way. Indeed, at the time, both Detective Rovella and Agent Gentil believed that Owens was not "in custody" for *Miranda* purposes, but advised him of his rights anyway. Moreover, there is no evidence in the record to contradict Detective Rovella's testimony that his omission of the warning advising Owens that anything he said could be used against him was anything other than inadvertent.

Since at the time of the interview Owens was already incarcerated, Owens had some previous experience with the criminal justice system. Owens did not testify that the failure to advise him up-front that anything he said could be used against him confused him, or coerced him, or compelled him to proceed with the interview, and nothing in the record suggests any lack of intelligence on his part. In the absence of deliberately coercive or improper tactics in obtaining the initial statement, "the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion." *Elstad,* 470 U.S. at 314, 105 S.Ct. 1285; *see also Rollins v. Leonardo,* 733 F.Supp. 763, 765–67 (S.D.N.Y. 1990). Accordingly, the Court finds that Owens' pre-*Miranda* statement was made voluntarily, and was free of any actual coercion.

In regard to the second issue, the Court finds, based on the totality of the circumstances, that Owens' post-*Miranda* written and sworn statement was made after a knowing and voluntary waiver of rights. The record includes a signed waiver form, and the uncontradicted testimony of Detective Rovella and Detective Gentil that Detective Rovella properly advised Owens of his rights by reading each right and asking Owens if he understood each right. Owens did not testify that the agents failed to advise him of his rights or that he signed the form unknowingly or involuntarily. (Tr. II at 136–182.) Rather, Owens relies solely on the initialing discrepancy between Josephs' waiver of rights form and Owens' waiver of rights form, to argue that Detective Rovella's testimony should "not be credited," and that the Court should find that Owens was never properly advised of his *Miranda* rights on December 16, 1999. (Owens' Post–Hr'g Br. at 7.) The Court, however, finds Detective Rovella's explanation for this discrepancy, (namely that Owens could not read), to be a reasonable one, and, therefore, finds it insufficient to undermine the credibility of Detective Rovella's testimony, and insufficient to prove that Owens was never properly advised of his rights. Accordingly, the Court concludes that the Government has shown, by a preponderance of the evidence, that Owens' post-*Miranda* written and sworn statement was made after a knowing and voluntary waiver of rights.

In regard to the final inquiry—whether suppression of the post-Miranda statement would serve the goals of deterring police misconduct and assuring receipt of truthful evidence—Owens argues that the officers' conduct here is an example of what the *Tankleff* court warned against. This Court, however, finds no indication in the record that these officers neglected the *Miranda* warnings to more easily obtain a confession, knowing that they could remedy the omission later. To the contrary, Detective Rovella administered all but one of the *Miranda* warnings, despite the fact

that at the time, he believed Owens was not even in custody for *Miranda* purposes. Under these circumstances, the Court finds no police conduct that it would wish to deter, and finds no indication that the truthfulness of Owens' statement was affected by the officers' behavior.

In sum, the Court concludes that 1) Owens' first statement, despite the procedural omission of one of his *Miranda* warnings, was free of any actual coercion, and, therefore, did not taint his second statement; 2) the second statement was made after a proper advisement of rights by the officers and a knowing and voluntary waiver by Owens, thereby curing the previous defect; and 3) that suppression of the second statement would neither deter police misconduct nor ensure the admission of truthful testimony. Accordingly, the Court finds Owens' post-*Miranda* written statement admissible. Owens' motion to suppress his December 16, 1999 post-*Miranda* statement, therefore, is denied, and his motion to suppress his pre-*Miranda* statements of the same date is denied as moot.

### b. *December 21, 1999 Statements*

The facts surrounding Owens' testimony before the grand jury on December 21, 1999 are somewhat unusual. What is not in dispute about that day is that, at 11:42 a.m., Owens appeared before the grand jury and was advised that the grand jury was investigating Hamilton's murder, that he was a target of the investigation, that the grand jury already had information indicating that he was involved in the murder, that he had a Fifth Amendment right against self incrimination, and that he had the right to consult with an attorney. (Gov't's Resp. to Owens, Attach. H (transcript) at 2–3.) Upon hearing this, the following colloquy transpired:

A: Yes. I would love an opportunity to. I would love to have an attorney beside me right here.

Q: You can't have an attorney beside you right here because these are secret proceedings. If you wish to speak to an attorney, you have a right to do so. Do you wish to do so?

A: Yes, I wish to do so before you state all of it right now in the procedure, everything.

Q: You should stop talking at this point because as I understand, you wish to speak to an attorney, correct? You're nodding your head yes. Mr. Foreman, I ask that the witness be excused because he has invoked his right to speak with an attorney. May he be excused?

FP: Yes. (witness excused at 11:48 a.m.)

(*Id.* at 4.) At this time, Owens was brought down to the Marshal's lock-up. Sometime later, Owens was brought back up to the library in the U.S. Attorney's Office to talk to AUSA Ring and Agent Gentil. At 2:27 p.m., Owens re-appeared before the grand jury and was re-advised of all of his rights and was reminded that he was a target of the investigation. Thereafter, the following colloquy transpired:

Q: After you left the Grand Jury earlier today, can you tell the members of the Grand Jury what happened?

A: I said I want to come back here. If I didn't I wouldn't be here.

Q: When you were in the Grand Jury last time, you indicated that you wished to consult with an attorney, correct?

A: Yes, but lay it down. I'm coming straight up.

Q: After you left the Grand Jury room, would it be fair to say that you told

the officers that you wanted to come back here?

A: Exactly.

Q: You said you didn't want to talk to an attorney, you wanted to come back to the Grand Jury?

A: Correct.

Q: You're the one that said that to the officers?

A: Correct.

Q: I'm not mischaracterizing?

A: Correct.

(*Id.* at 7–8.) Owens then proceeded to testify, and was indicted the following day. At issue is what transpired that morning before Owens' initial appearance, and what transpired between his two appearances. On these issues, Owens' account and the Government's account vary dramatically.

At the suppression hearing, Owens testified that when he was brought from HCC to the federal courthouse on December 21, 1999, he did not know why he was going there. Owens was brought to a holding cell, and thereafter brought to an "office" by Detective Rovella and Agent Gentil. Owens testified that the officers did not say anything to him until they were in the office. Once in the office, Owens claims that he was "told" he was going in front of a grand jury about the statements he made in HCC, that the prosecutor was going to ask some questions, and that he had to answer them. (Tr. II at 140.) Owens also stated that Agent Gentil "briefed" him about the statement he made at HCC and told him that he should give the grand jury the same statements he made in HCC. (Tr. II at 140–41, 159.) Owens testified that they did not tell him about the time he might be facing, or about other evidence the grand jury might be hearing that day, or that several people would be there writing and listening. Owens claims that he was "brainwashed by these two

cops right there," (Tr. II at 160, 169), and "shook" by the grand jury, and that is why he wanted a lawyer. (Tr. II at 142.)

Owens was taken from the grand jury room back down to the Marshal's lock-up by Agent Gentil, Detective Rovella, and Detective John Koch, another Task Force member. On the trip down, Owens claims Detective Rovella told him that "they give me a chance to talk to the grand jury, and I messed up, so they just going to take me back downstairs and take me to Hartford CC." (Tr. II at 143.) Owens also testified that Detective Rovella seemed "upset" and "angry," and said "he was going to use the full hammer on me.... [f]our hammer, yes. So he—like he said, he got four evidence against me to say I commit a crime." (Tr. II at 145.) Owens identified the "four hammers" as the tape recorded conversation, his written statement at HCC, "Quami's [sic]" statement (Josephs), and "Poochi's" statement (Hamilton's sister). (Tr. II at 145.) Owens admitted that he told the officers he wanted to go back to the grand jury to tell them his story, but maintained that it was only after the officers said they were going to "hit" him with "four hammers." (Tr. II at 151.) According to Owens, the officers told him that he had "blown" his chance and that they were taking him back to the jail where he could get a lawyer.

After waiting a while in the Marshal's lock-up, Detective Rovella and Agent Gentil took Owens to a library near the grand jury room and, according to Owens, told him that they were giving him a chance to go back to the grand jury. Owens claims that the officers told him that if he told the truth, it would help him in the grand jury, and that by cooperating and testifying, he would get less time than Josephs, and would not be facing "the judgment of life imprisonment or death." (Tr. II at 147, 178–79, 181.) Owens also stated that the

officers asked him how much time he thought he was getting, that he said "ten," and that they laughed. (Tr. II at 147.)

Owens testified that before he went back into the grand jury, Agent Gentil and AUSA Ring were "coaching" him for half an hour or more, telling him that "you got to let them know that—they don't tell me to say I don't want the lawyer, okay? Because he going to ask me this question, I got to answer to let them know I don't need a lawyer, I come back willfully on my own," (Tr. II at 149–50, 169, 173–74), and that he had to give the same statement he gave in the "paperwork" at HCC. (Tr. II at 175.) When asked about his state of mind on that day, Owens testified that he was "high" on cocaine/crack, that he told the detective in the library that he was high, that, he was high when he gave the statement in HCC, and that he had "three eight balls" at HCC. (Tr. II at 147–48, 162–64.)

In contrast, Agent Gentil testified that although it was rare, they had on occasion brought targets of serious crimes to the grand jury to "afford them an opportunity to testify." (Tr. II at 113.) On the morning of December 21, 1999, before Owens' initial appearance, Detective Gentil stated that he explained the format of the grand jury, asked Owens if he wanted to testify, and went over some of the questions he would be asked to answer if he chose to testify. According to both Detective Rovella and Agent Gentil, Owens was quite "anxious to get in there and testify and tell his side, as he called it." (Tr. I at 170; Tr. II at 91.) Finally, Agent Gentil denied telling Owens that he had to "stick to his story" in the written statement or face possible perjury charges. (Tr. II at 128–29.)

Detective Rovella, Agent Gentil, and Detective Koch each testified that during the transport from the grand jury to the Mar-

shal's lock-up after Owens left the grand jury the first time, Owens began talking and said that he did not understand, that he was afraid with all of the people in the grand jury, but that he wanted to go back in and testify to explain his side. All three officers maintain that Owens initiated the conversation. (Tr. I at 13–15, 23, 171; Tr. II at 93.) According to both Detective Koch and Agent Gentil, Agent Gentil told Owens that because he had asked for a lawyer, they could not talk to him, and he was not going to testify. Also according to both officers, Owens repeated his request to return to the grand jury all the way down to the marshal's office. Finally, Both Agent Gentil and Detective Rovella denied telling Owens that he had blown his chance of telling his side and getting a better deal.

More than half an hour later, Detective Rovella and Agent Gentil went back down to the Marshal's lock-up, and asked Owens if he wanted to testify again. According to Detective Rovella, Owens was anxious to do so, and said that he was afraid the first time but wanted to get back in there. The agents brought Owens up to the library in the U.S. Attorney's Office where Agent Gentil remained with Owens until he testified, (approximately an hour), during which time Detective Rovella and AUSA Ring came in and out. Agent Gentil testified that while in the library, Owens said he did not want a lawyer, and that he "wanted to tell his story straight up." (Tr. II at 95, 134.) At one point, Owens was told he would not be allowed to go back in and, according to Agent Gentil, he became visibly annoyed and rose out of his chair, pleading to go back in and testify. (Tr. II at 96.) Finally, at some point before going back in to the grand jury, Owens asked what would happen to him if he did not testify, and, according to Agent Gentil, both he and AUSA Ring told Owens that

he was likely to be indicted either way. (Tr. II at 95–96; 125.)

Detective Rovella stated that he was in and out of the library during that time, but that he heard Owens "adamantly" saying he wanted to return to the grand jury to testify to tell his side, and heard Agent Gentil instructing Owens that if he went back in he would be informed of all of his rights again and reminded that he was a target of the investigation. When Owens said "his story," Detective Rovella understood that to mean the story where "Quami [sic]," not he, was doing the stabbing. (Tr. II at 34.) Detective Rovella said that during the time he was in and out of the library, he never heard Agent Gentil or AUSA Ring telling Owens what he had to say when he went ·back in to the grand jury. Finally, both Agent Gentil and Detective Rovella admitted that neither they, nor anyone in the U.S. Attorney's Office to their knowledge, ever attempted to arrange for counsel for Owens on that day. (Tr. I at 205; Tr. II at 94–95.)

In *Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), the Supreme Court held that, once a suspect has clearly asserted his right to have counsel present, law enforcement officers must immediately cease all questioning until counsel is made available to him, "unless the accused himself initiates further communication, exchanges, or conversations with the police." Once the right to counsel is invoked, "a subsequent waiver of that right—even if voluntary, knowing, and intelligent under traditional standards—is presumed invalid if secured pursuant to police initiated conversation." *Michigan v. Harvey*, 494 U.S. 344, 345, 110 S.Ct. 1176, 108 L.Ed.2d 293 (1990) (citing *Michigan v. Jackson*, 475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986)). This additional layer of "prophylaxis for the *Miranda* right to counsel," the Supreme

Court has explained, "is designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights." *Davis v. United States*, 512 U.S. 452, 457, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994).

■ Applying these standards, the Second Circuit employs a two-part test. Once an accused invokes his right to counsel, responses to further questioning may only be admitted upon a finding that he "(a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked." *United States v. Spencer*, 955 F.2d 814, 818–19 (2d Cir.1992).

Here, Owens claims that his grand jury testimony should be suppressed because 1) he was not advised of his *Miranda* rights during the meeting before he first entered the grand jury, 2) he did not initiate communications with the agents after invoking his right to an attorney, and 3) he did not knowingly and voluntarily waive his *Miranda* rights when he returned to the Grand Jury. The Government maintains that the discussions with Owens prior to his entering the grand jury for the first time did not constitute an interview, that Owens initiated contact with the officers, and that Owens knowingly waived his rights the second time around.

■ The Court finds the issue of whether Owens was advised of his rights during the initial briefing session inapposite. There is no evidence, or even claim, that this was an interrogation of any kind. Therefore, although Owens was likely in custody at that time, no advisement of rights was necessary.

■ Turning to the two-part test, the first issue—who initiated conversations after Owens invoked his right to counsel—is difficult for the Court to determine. Owens argues that because the Government

had spent a great deal of time and energy preparing to present Owens to the grand jury, and because they had briefed him on the format of testifying before the grand jury, Owens' "sudden, unexpected and embarrassing departure from the grand jury" surprised and upset Agent Gentil and Detective Rovella. (Owens' Post–Hr'g Br. at 10.) Therefore, Owens argues, "it is only reasonable to believe," as Owens testified, that Agent Gentil and Detective Rovella initiated conversation with Owens and told him he had blown his chance. (*Id.*) The Government challenges this reasoning on the ground that it is premised on the fact that the Government was "desperately" trying to force Owens to testify and, therefore, angry when he refused to do so. The Government explains that by the time Owens testified in the grand jury, they already had overwhelming evidence against Owens (the taped conversation, his statement at HCC, and his fingerprints), and so his testimony was not critical to his indictment.

This issue is a close one. However, based upon careful consideration, the Court finds that, although the officers may have engaged in conversation with Owens by way of response, it was Owens who initiated communications after he left the grand jury. The Court finds the Government's account of the trip down to the Marshal's lock-up credible, because, in addition to the consistent testimony of the three officers involved, it is more plausible that Owens, upon his abrupt dismissal from the grand jury without testifying, would be asking questions about why this had happened, than that the officers were angry about him not testifying. Further, even if in the process of telling Owens that because he had asked for an attorney he could not testify, the officers told him that he had "messed up" or "blown it," those comments would not change the fact that Owens initiated the conversation. More-

over, the Court is not at all convinced that the officers' comments, regardless of their exact content, were intended to badger Owens into waiving his previously asserted *Miranda* right. Rather, they were simply responding to Owens' inquiries and telling him why he could not testify. Finally, the Court is convinced, based on all the testimony, that, Owens is the one who first requested to follow through with his grand jury testimony. There is no indication in the record that either the officers or AUSA Ring recommended, suggested, or even hinted at this as an option until after Owens persistently requested to do so.

In regard to the second prong—whether Owens ultimately knowingly and voluntarily waived his rights—the transcript of the advice and waiver of rights speaks to the fact that the advisement and waiver actually took place, and that no coercion transpired during the execution of this exchange. Owens argues, however, that this waiver was involuntary because throughout the morning he was lied to, pressured, and induced with promises that his sentence would be reduced if he testified. Owens argues that it is the officers' "lack of candor" about their use of these various interviewing techniques which undermines their credibility and indicates that they, in fact, utilized these methods with Owens. (Owens' Post–Hr'g Br. at 11.)

Aside from telling Owens that the truth would help him, and telling him that he possibly faced life for the crime for which he was charged, all three officers deny making Owens any promises or telling him that he would receive a lesser punishment if he testified. Additionally, the Government argues, and the Court agrees, that the implications of Owens' claims are "extraordinary" since they involve unnecessary risks on the Government's part. Owens urges the Court to believe that the Government was so intent on obtaining

Owens' grand jury testimony that they initiated conversation with him, told him what to say in the grand jury, and then trusted that he would say it, all knowing that he was on drugs at the time. Finally, and quite simply, Owens did not specifically testify that the officers initiated the contact, or that they persuaded him to waive his rights.

Upon careful consideration, the Court finds that Owens' account defies common sense, and finds any "lack of candor" on the officers' part regarding their general interviewing practices insufficient to undermine the officers' otherwise credible testimony. Based on these findings, the Court finds little. evidence to undermine the facial validity of the grand jury advice and waiver of rights exchange. Therefore, despite these highly unusual circumstances, and despite the fact that the Court finds the Government's decision to allow a defendant who has invoked his right to counsel to testify before a grand jury without speaking to an attorney or even attempting to arrange for counsel, highly objectionable, the Government has met its burden of proving the voluntariness of Owens' ultimate waiver of rights. Accordingly, because the Court finds that Owens initiated communications with the officers and that he voluntarily waived the right he had previously invoked, Owens' grand jury testimony is admissible and his motion to suppress is denied.

B. *Severance Motion*

■ Defendant Josephs moves for severance of his trial on the ground that Owens has made several statements that would incriminate Josephs if they were admitted during a joint trial. Because the United States has represented that it intends to admit such statements against Owens and anticipates that Owens will attempt to shift blame to Josephs as part of his defense, a clear *Bruton* problem exists. Accordingly, Josephs' motion to sever is granted.

## IV. CONCLUSION

Based on the reasons set forth above, Josephs' motion to suppress his November 15, 1999 statements [doc. no. 32] is DENIED, Owens' motion to suppress his December 16, 1999 statements and his December 21, 1999 grand jury testimony [doc. no. 27] is DENIED as moot, in part, and otherwise DENIED, and Josephs' motion to sever [doc. no. 34] is GRANTED. So ordered.